Filed 1/28/15  Modified and Certified for Publication 2/9/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICHARD RAY CISNEROS,<br><br>    Defendant and Appellant. | B247844<br><br>(Los Angeles County<br>Super. Ct. No. BA389575) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jose I. Sandoval, Judge.  Reversed and remanded.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Richard Ray Cisneros appeals from the judgment entered following his conviction by a jury of two counts of making a criminal threat against Ebony Pitts. Cisneros contends the trial court erred in denying his *Batson/Wheeler*[1] motions alleging the prosecutor had discriminated against men in exercising peremptory challenges during jury selection.[2] We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Information*

Cisneros was charged by information with two counts of making a criminal threat against Pitts (Pen. Code, § 422) (counts 1 and 2),[3] one count of failure to register as a sex offender (§ 290, subd. (b)) (count 3) and one count of sexual intercourse with a minor, Pitts (§ 261.5, subd. (c)) (count 4). The information specially alleged, as to count 1, Cisneros had personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)); as to counts 1 and 2, Cisneros had suffered a prior serious felony conviction (§ 667, subd. (a)(1)); and, as to all counts, Cisneros had suffered one prior serious or violent felony conviction within the meaning of the three strikes law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)). Cisneros pleaded not guilty and denied the special allegations.

2. *Summary of Evidence Presented at Trial*

a. *The People's evidence*

i. Pitts's preliminary hearing testimony

After the trial court found Pitts was unavailable to testify at trial, it permitted her preliminary hearing testimony to be read to the jury. Pitts had testified she met Cisneros

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258.

[2] Cisneros also contends the trial court abused its discretion in refusing to admit testimony that Pitts had said she could not be bothered testifying at trial and denying his motion for a new trial based on newly discovered evidence. Because we reverse for *Batson/Wheeler* error, we need not address those arguments.

[3] Statutory references are to the Penal Code unless otherwise indicated.

in 2010 when she was 17 years old and he was 36 years old. Pitts told Cisneros her age before they had sex four days after they had met.

In May 2011 Cisneros and Pitts were engaged and living together with their infant son. On the evening of May 23, 2011 Cisneros and Pitts were arguing when Pitts's sister called. After Pitts told her sister she and Cisneros were arguing, Cisneros became enraged that Pitts was "telling everybody our business" and took a 12- to 14-inch butcher knife out of the kitchen drawer. Cisneros told Pitts, "When you get off the phone, I'm going to get you. I'm going to kill you." Cisneros, who was standing about six feet away, made forward thrusting movements with the knife toward Pitts's stomach.

When Cisneros turned his back, Pitts, scared, ran out of the apartment carrying the infant. She called the police emergency number, and a recording of the call was played for the jury. Pitts later told the district attorney she had lied about the incident. Pitts testified Cisneros had promised he would never threaten her again and would go to counseling and church.

On October 3, 2011 Pitts was doing errands when Cisneros called and told her, "[C]ome get this bitch ass baby, he needs his mom, I might hurt him." Pitts returned home, picked up the child and left. Cisneros called her, saying, "I don't understand why you are playing these games." When Pitts told him to calm down and that she was going to call the police, Cisneros said, "[W]ell, the police, that's not going to do shit. All I'm going to do when I get out is I'm going to find you and I will kill you." Pitts, who was scared because Cisneros had told her stories about his past, went to the police station and filed a report.

ii. Law enforcement personnel testimony

On May 23, 2011 Los Angeles Police Officer Matthew Oropeza and his partner responded to a call about possible domestic violence. They met Pitts, who was holding a baby, in a McDonald's parking lot. Pitts, crying and afraid, explained Cisneros had threatened to kill her while wielding a knife when she was on the telephone with her sister. Pitts told the officers she and Cisneros did not live together and did not have any

3

children.  The officers took Pitts to the police station and subsequently detained Cisneros, whom they found walking about a block and a half from Pitts's home.  When officers placed Cisneros in the police car, he began to kick and bang his head on the glass partition separating the front and back seats.

After the incident Pitts did not return telephone calls from law enforcement.  On the day the case was going to be filed Los Angeles Police Detective Jeffrey Sandefur and a deputy district attorney were finally able to reach Pitts by telephone.  Pitts told them her initial report had been fabricated, and the district attorney decided not to file charges against Cisneros.

On October 3, 2011 Pitts—crying, hysterical and carrying her infant child— approached the front desk of the Olympic Division police station.  She told Officer Angel Alfaro she had just received a telephone call from Cisneros, her "live-in boyfriend," threatening to kill her.  She said she believed he would do it because he had a violent past.  Pitts also told Alfaro that the young child was her and Cisneros's son.  Cisneros was found inside Pitts's home and arrested.

Detective Sandefur interviewed Pitts in person after the October 3, 2011 incident.  Pitts told him she had recanted her report of the May 2011 incident because she was afraid.  She said her initial report to the police had been correct.

### iii.  Evidence of prior acts of domestic violence

Mignonette Jones testified she and Cisneros lived together and had an intimate relationship from 1999 through 2004.  Cisneros was physically and verbally abusive to Jones during the relationship and had threatened to kill her and their 11-year-old son.  After their intimate relationship ended, Cisneros lived with Jones "off and on" and continued to be abusive, including punching and kicking her.  One day in April 2006 Cisneros pulled out Jones's hair during a fight.  Cisneros left the home after Jones asked him to, but returned later that day and threatened to kill Jones and their son.  As a result of that incident Cisneros was convicted of inflicting corporal injury upon a spouse or cohabitant (§ 273.5, subd. (a)), and Jones obtained a restraining order against him.

4

Notwithstanding the conviction and restraining order, Cisneros continued to verbally abuse Jones and kicked her in the stomach on one occasion.

        b. *The defense's evidence*

Cisneros testified on his own behalf. He insisted Pitts was already pregnant when he met her in February 2010. Cisneros agreed to be the child's father because Pitts did not want the biological father to be involved in his life. Pitts was 18 years old when they first had sex.

According to Cisneros, in February 2011 Pitts and Cisneros ended their relationship but he continued to see the child twice a month. On May 23, 2011 Pitts became angry with Cisneros after he raised concern about Pitts smoking cigarettes and marijuana in the apartment because the young child had bronchiolitis. Because he was concerned Pitts was smoking carelessly around the boy, Cisneros took her container of marijuana when he left the apartment. Pitts was upset and demanded that he return it, but he did not. Cisneros never threatened Pitts or pointed a knife at her. He banged his head on the glass partition in the police car because he thought it was unfair he was going to jail when "nothing happened."

On October 3, 2011 Cisneros was watching the child while Pitts was running errands. Pitts became angry because Cisneros refused to give her information she had requested in a telephone call and, in a subsequent call, refused to tell her where she could purchase marijuana. Pitts came home, got the child and left again, asking Cisneros to wait until she returned so he could help her with the shopping bags. Cisneros, who never threatened Pitts, waited. Shortly thereafter the police arrested him in Pitts's apartment.

        4. *The Verdict and Sentencing*

The jury found Cisneros guilty of two counts of making a criminal threat and found true the special allegation he had used a dangerous weapon during the commission of the May 2011 incident. The jury was unable to reach a verdict on the remaining counts, and the court declared a mistrial as to them. They were later dismissed.

Cisneros admitted the prior conviction allegations, and the court sentenced him to an aggregate state prison term of 11 years, four months, comprised of the middle term of two years on count 1, doubled under the three strikes law; plus one year for the dangerous weapon enhancement; plus an additional five years for the section 667, subdivision (a)(1), enhancement; plus one-third the middle term of two years on count 2, doubled under the three strikes law.

## DISCUSSION

1. *Voir Dire Proceedings*

    a. *The first <u>Batson/Wheeler</u> motion*

Jury selection took place over two days. Forty jurors were brought into the courtroom and divided into two groups of 20. After the first 20 jurors were questioned by the court and attorneys, some were excused for cause. Twelve jurors were placed in the jury box, at least four of whom were male.[4] The prosecutor accepted the jury as constituted; but defense counsel exercised a peremptory challenge, excusing a prospective female juror, who was replaced with another prospective female juror. The prosecutor again accepted the jury; but defense counsel dismissed a prospective female juror, who was replaced with a prospective male juror. The prosecutor and defense counsel each exercised several additional challenges, with the prosecutor excusing only prospective male jurors. After the court dismissed additional prospective jurors for cause, the second group of 20 prospective jurors was questioned by the court and attorneys.

Peremptory challenges resumed, and the prosecutor excused another prospective male juror. Defense counsel made a *Batson/Wheeler* motion, arguing, "The only four challenges the People have exercised in consecutive order have all been men, and I

---

[4] Because the jurors were referred to by number rather than name, the gender of some of them cannot be definitively determined from the record on appeal. However, it appears (for example, from the use of "Sir" or "Ma'am") eight women and four men were seated in the jury box at this time.

6

believe that sex is a protected class and as such the defense has met its prima facie burden in establishing the four consecutive jurors who were kicked off [are] from a protected class." The court found a prima facie case of discrimination, and the prosecutor explained her reasons for eliminating the prospective male jurors: Juror 7 because, having been arrested a few times and in a bar fight, he was a "kind of rough around the edges guy"; Juror 13 because he was an engineer and engineers tend to be "extremely nit-picky" and "over-analytical"; Juror 19 because his responses were limited to yes or no answers and he seemed robotic; and Juror 24 for similar reasons as Juror 19. The court denied the *Batson/Wheeler* motion, finding the prosecutor's reasons for excusing the prospective jurors were independent of their gender.

        b. *The second <u>Batson/Wheeler</u> motion*

After the prosecutor exercised her fifth peremptory challenge to excuse another prospective male juror, defense counsel renewed her *Batson/Wheeler* motion. The court found a prima facie case of discrimination, and the prosecutor explained, "I'm kicking Juror No. 6 because I believe the [next] person . . . that is slated in his position, in my view, is a better fit for what I like, that's the gentleman that was inquired of at length by the defense." After the trial court expressed doubt that was a legitimate reason—stating, "my understanding of the case law is they must focus in on that particular juror for kicking that juror and not for liking someone else who's coming up next"—the prosecutor argued, "I'm replacing him with a male. And I think he's a better fit." She also explained, as to Juror 6, "we didn't get a whole lot of information from him other than . . . his area of residence and his occupation."[5] The court denied the *Batson/Wheeler* motion, finding the prosecutor's reason for excusing Juror 6 was not gender related.

---

5      Juror 6 had also said he was married with two children and his wife stayed home with the children.

7

c. *The third Batson/Wheeler motion*

Defense counsel made a third *Batson/Wheeler* motion after the prosecutor exercised her eighth peremptory challenge to excuse Juror 31, one of three men in the jury box at the time. The trial court did not find a prima facie case of discrimination although it allowed the prosecutor to explain her reasons for excusing Juror 31.

d. *The fourth Batson/Wheeler motion*

Juror 31 was replaced by male prospective Juror 32. After the prosecutor used her ninth peremptory challenge to excuse him, defense counsel made a fourth *Batson/Wheeler* motion. The trial court found a prima facie case of discrimination. The prosecutor explained her decision in part, "I'm kicking this juror not for a gender based reason, but because I believe the next juror in line, Juror No. 34, is a better fit. Juror No. 34 was very involved in the voir dire process. He's the country club manager. He is very conservative in his appearance and very conservative in his answers that he shared."[6] The court denied the *Batson/Wheeler* motion, explaining that replacing one potential male juror with another male juror who appeared more favorable toward the prosecution was a genuine, gender-neutral reason that did not deny equal protection.[7] The panel that was finally accepted was comprised of 10 women and two men.

2. *Governing Law*

"A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also

---

[6] Juror 34 also said one of his staff members was a retired deputy sheriff.

[7] After counsel for Cisneros used six of seven peremptory challenges to excuse potential female jurors, the prosecutor made a *Wheeler/Batson* motion. The court found a prima facie case of discrimination with respect to two of the excused jurors, but further found defense counsel's explanation for excusing them to be nondiscriminatory.

8

violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Avila* (2006) 38 Cal.4th 491, 541, citing, inter alia, *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79, 88 [106 S.Ct. 1712, 90 L.Ed.69] (*Batson*).) The procedural and substantive standards trial courts properly use when considering motions challenging peremptory strikes are well-established: " " " First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.' " " (*People v. Hamilton* (2009) 45 Cal.4th 863, 898, quoting *Snyder v. Louisiana* (2008) 552 U.S. 472, 476-477 [128 S.Ct. 1203, 170 L.Ed.2d 175].)[8]

Here, we are concerned with the second step of the analysis because the trial court on several occasions found a prima facie case of discrimination, a finding not challenged on appeal. " 'The second step . . . does not demand an explanation that is persuasive, or even plausible. "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." ' " (*People v. Reynoso* (2003) 31 Cal.4th 903, 916; see *Hernandez v. New York* (1991) 500 U.S. 352, 360 [111 S.Ct. 1859, 114 L.Ed.2d 395] [" [a] neutral explanation" at the second step of a *Batson/Wheeler* analysis "means an explanation based on something other than the race of the juror"].) A prosecutor's reason for the strike need not " 'make[] sense' " to be considered legitimate for *Batson/Wheeler* purposes; the reason need only be one " 'that

---

[8]    The *Batson*/*Wheeler* principles apply to peremptory challenges excusing jurors improperly on the basis of race, gender or ethnic grounds. (See *People v. Avila*, *supra*, 38 Cal.4th at p. 541.) Most of the cases discussing these principles, however, refer only to race. For ease of reference we will not modify the quotations to reflect the fact that gender bias is alleged in the instant case.

does not deny equal protection.'" (*Reynoso*, at p. 916; see *People v. Jones* (2011) 51 Cal.4th 346, 360 ["'prospective juror may be excused based upon facial expressions, gestures, hunches, and even arbitrary and idiosyncratic reasons'" as long as the reason "'does not deny equal protection'"]; *People v. Perez* (1994) 29 Cal.App.4th 1313, 1330, fn. 8 ["[p]eremptory challenges based on counsel's personal observations are not improper"].) Whether the prosecutor offered a gender-neutral reason for exercising a peremptory challenge is a question of law subject to independent review. (*People v. Alvarez* (1996) 14 Cal.4th 155, 198, fn. 9.)

Purposeful discrimination in the exercise of peremptory challenges is structural error that is reversible per se: "*Batson* itself as well as the cases that follow it confirm that when a violation of equal protection in jury selection has been proven, the remedy is a new trial, without the need for any inquiry into harmless error or examination of the empaneled jury." (*Winston v. Boatwright* (7th Cir. 2011) 649 F.3d 618, 627.) Even "[t]he exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal." (*People v. Silva* (2001) 25 Cal.4th 345, 386; see *Wheeler*, *supra*, 22 Cal.3d at p. 283 [infringement of right to a fair and impartial jury is "prejudicial per se"].)

3. *The prosecutor's explanation for excusing Jurors 6 and 32 was not gender neutral*

The prosecutor explained she had excused Juror 6 (the second *Batson/Wheeler* motion) and Juror 32 (the fourth motion) because in each instance she preferred the next prospective juror. Although the prosecutor provided some information about why the next jurors were desirable, she failed to identify any characteristics whatsoever about Jurors 6 and 32 or articulate personal observations about their demeanor or even a hunch about them that animated the decision to excuse them. She thus failed to carry her step two burden to proffer a gender-neutral explanation for dismissing them. (See *Miller-El v. Cockrell* (2003) 537 U.S. 322, 328 [123 S.Ct. 1029, 154 L.Ed.2d 931 ["prosecution must offer a race-neutral basis for striking the juror in question"]; accord, *People v. Hamilton*,

10

*supra*, 45 Cal.4th at p. 898; see generally *Rice v. Collins* (2006) 546 U.S. 333, 338 [126 S.Ct. 969, 163 L.Ed.2d 824] [if defendant has made a prima facie showing peremptory challenge was exercised on the basis of race or gender, "the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question"].)

In concluding the prosecutor failed to adequately respond to defense counsel's prima facie showing of group bias in her exercise of peremptory challenges, we do not question the trial court's acceptance of the genuineness of the prosecutor's stated reason. (Cf. *People v. Avila, supra*, 38 Cal.4th at p. 541 ["[a]s long as the court makes 'a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal'"].) However, whenever counsel exercises a peremptory challenge, it necessarily means that he or she prefers the next prospective juror to the one being challenged (whether the individual qualities of the next person are known or unknown). It is, in effect, no reason at all. Thus, simply reciting this truism while striking a prospective juror who is a member of a protected class is not an adequate nondiscriminatory justification for the excusal, particularly when, as here, in each instance to reach the preferred next prospective juror the prosecutor elected to strike a prospective male juror rather than one of the many prospective female jurors then seated in the jury box.[9] (See *Batson*, *supra*, 476 U.S. at pp. 97-98 [the prosecutor may not rebut the defendant's prima facie case "merely by denying that he had a discriminatory motive or '[affirming] [his] good faith in making individual selections.' [Citation.] If these general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause 'would be but a vain and illusory requirement.' [Citation.] The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried."].) The bar was not high—the explanation did not even have to be persuasive or even plausible, just adequate enough for the court to ensure it was not

---

[9]    There were nine women in the jury box both when Juror 6 and Juror 32 were excused.

inherently discriminatory.[10] (*Rice v. Collins, supra*, 546 U.S. at p. 338; see *Wheeler*, *supra*, 22 Cal.3d at pp. 282-283.)

To be sure, the prosecutor was willing to accept some men on the jury; she twice accepted the panel when it had four men on it. But the question is not whether some members of the protected classification were acceptable, it is whether any juror, when excused, was dismissed because of group bias. (See *People v. Avila*, *supra*, 38 Cal.4th at p. 549 ["[w]hen a party makes a *Wheeler* motion, the issue is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias"].) The prosecutor's failure to articulate anything about Jurors 6 and 32 as the basis for striking them after the trial court had found a prima facie case of group bias did not nothing to dispel the reasonable inference the prosecutor preferred women to men and was exercising her peremptory challenges to effect that preference.

## DISPOSITION

The judgment is reversed, and the matter is remanded for a new trial.

PERLUSS, P. J.

We concur:

WOODS, J.                        FEUER, J.[*]

---

[10]    The trial court properly accepted as gender neutral the prosecutor's explanation she had excused prospective male Jurors 29 and 24 because they were "robotic" and responded only with yes or no.

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICHARD RAY CISNEROS,<br><br>    Defendant and Appellant. | B247844<br><br>(Los Angeles County<br>Super. Ct. No. BA389575)<br><br>ORDER MODIFYING AND<br>CERTIFYING OPINION<br>FOR PUBLICATION<br>(CHANGE IN JUDGMENT) |

THE COURT:

It is ordered that the opinion filed herein on January 28, 2015 be modified as follows:

1. On page 2, the entire opening paragraph, beginning "Richard Ray Cisneros appeals from" is deleted and the following paragraph is inserted in its place:

Richard Ray Cisneros appeals from the judgment entered following his conviction by a jury of two counts of making a criminal threat against Ebony Pitts. Cisneros contends the trial court erred in denying his *Batson/Wheeler*[1] motions, arguing the prosecutor failed to rebut his prima facie showing she had discriminated against men in exercising peremptory challenges during jury selection.[2] Because the prosecutor's explanation she simply preferred the next prospective jurors, offered without identifying any characteristics of the men being excused, was not a nondiscriminatory justification, we reverse the conviction and remand for a new trial.

_____

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258.

[2] Cisneros also contends the trial court abused its discretion in refusing to admit testimony that Pitts had said she could not be bothered testifying at trial and

denying his motion for a new trial based on newly discovered evidence. Because we reverse for *Batson/Wheeler* error, we need not address those arguments.

2. The above-entitled opinion was not certified for publication in the Official Reports. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), appellant's request pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

This modification changes the judgment.

_____

PERLUSS, P. J.          WOODS, J.          FEUER, J.[*]

_____

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.